## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | |
| | ) | No. 33741-3-III |
| E.G. | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

KORSMO, J. — J.G. appeals from an order terminating his parental rights to his child, E.G. Concluding that all necessary services were provided and that it was necessary to terminate the parent-child relationship in order to provide the child a permanent home, we affirm.

### FACTS

E.G was born January 29, 2013 in a Newport hospital to H.G. and J.G. When the hospital initially used H.G.'s family name for the child's surname on the hospital records, J.G. became enraged, yelling at staff, throwing bibles, and making threats. The mother and child were transferred to a hospital in Spokane; his volatile behavior continued there.

J.G. sought to move the child to a different Spokane hospital, against medical advice, so the Department of Social and Health Services (DSHS) intervened. A shelter care hearing was held and E.G. was placed in the care of his maternal aunt and uncle.

No. 33741-3-III
*In re E.G.*

J.G. was ordered to undergo random urinalysis, a psychological evaluation, and a parenting assessment.[1] Services were reserved for a future hearing. Ex.1-13.[2]

J.G. did not attend either of the two evaluative referrals ordered by the court. However, he did obtain his own drug assessment. It showed that he was in full remission for chemical dependency and had an active cannabis dependency; outpatient treatment was recommended. Report of Proceedings (RP) at 23. The record does not reflect when the evaluation was called to the attention of DSHS or the court.

Five months later, a dependency order was entered by the agreement of the parties.[3] The child remained with his aunt and uncle, "pending transition into parental care." Ex.1-20. The order also directed that J.G. successfully complete evaluations, and follow all recommendations, in the following categories: (1) drugs and alcohol, (2) psychological, (3) domestic violence perpetrator assessment, and (4) couples counseling. He also was required to participate in random urinalysis. *Id.* The drug and alcohol evaluation requirement also stated that J.G. "has done an eval, but may request that the eval be updated." *Id.*

---

[1] H.G. died in 2015, three months before the termination trial. Thus, our focus is on the facts related to J.G.'s appeal.

[2] All records of the dependency proceedings were submitted as Exhibit 1. Individual pages of that exhibit are denominated "Ex.1-[page number]."

[3] J.G. did not agree with the facts alleged in the dependency petition, but did agree that a dependency would be established if the case proceeded to trial. He expressly agreed that the services ordered were appropriate. Ex.1-17.

2

The first dependency review hearing was held February 20, 2014. With respect to drug dependency issues, the order indicated that J.G. wanted a referral for an evaluation. Ex.1-29. By the time of the permanency planning hearing on October 31, 2014, the agreed order indicated that the father was in compliance with the previous court order requiring him to undergo chemical dependency screening and any recommended substance abuse evaluation and treatment. Ex.1-52-53. The agreed order entered for the dependency review hearing on April 9, 2015, indicated that the only service that the father had not yet successfully completed was for mental health treatment and individual counseling. Ex.1-44.

The social worker initially assigned to the case later testified:

Q. So between the time of the—of the shelter care and the time you left the case in July of 2013, did you make any other referrals for services for [J.G.]?

A. Yes. (Inaudible). He himself—went down in early February and completed a chemical dependency assessment. And the assessment was that he—(inaudible) chemical dependency that was in full remission and a cannabis dependency, active, and he needed outpatient treatment once a week. And so I made the referral for that—Pend Oreille Counseling Center, —chemical dependency assessor there had also made the referrals for that. I referred him to—No, I don't think I referred him. He was referred by Pend Oreille Counseling Center for individual couples counseling also. (Inaudible) with them.

RP at 23.

Although J.G. complied with many services, he did not make progress in his mental health treatment. Desiring for E.G. to be adopted, DSHS filed to terminate the parent-child relationship. That matter eventually proceeded to trial.

A social worker testified that referrals had been made for all court-ordered services, as well as for other services. RP at 200. J.G.'s counsel argued that there was no connection between his alleged personality disorder and his ability to care for his child, he was not responsible for the lack of attachment with the child since he had never been allowed to parent, and DSHS had never fairly considered alternatives to termination of the parent-child relationship. RP at 477-491. Counsel never suggested that a necessary service had not been offered to the father. Instead, he contended that DSHS required too many unnecessary services. RP at 484.

The trial court disagreed with the father's assessment of the case, noting that J.G. had contentious or volatile relationships with nearly every service provider, and that his personality was an impediment to obtaining the skills necessary to parent. The court also found that all necessary services were provided. Written findings in support of the court's determinations were entered. J.G. then timely appealed to this court.

## ANALYSIS

J.G. argues on appeal that he was not provided necessary services relating to substance abuse and couples counseling, and that the court erred in determining that termination was the preferable option for integrating E.G. into a permanent home. We

4

address the two issues in the order stated after first noting the general principles governing appeals from termination rulings.

The termination of parental rights statute provides a two-step process. The first step focuses on the adequacy of the parents, which must be proven by clear, cogent, and convincing evidence, and the second step focuses on the child's best interests, which need only be proven by a preponderance of the evidence; only if the first step is satisfied may the court reach the second. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). When assessing the adequacy of the parents, RCW 13.34.180(1) lists six elements that the State must prove.

In order to terminate parental rights, the State must present evidence establishing that (1) the child has been found to be dependent, (2) the court has entered a dispositional order, (3) the child has been removed from the custody of the parent for at least six months, (4) all the necessary services have been afforded to the parent to correct the parental deficiencies, (5) there is little likelihood of remedying the parental deficiencies, and (6) continuation of the parent-child relationship clearly diminishes the child's prospects of permanent placement. RCW 13.34.180(1).

This court reviews factual findings for substantial evidence. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 568, 815 P.2d 277 (1991). The findings required to terminate a parent-child relationship must be established by "clear, cogent, and convincing evidence." RCW 13.34.190(1)(a)(i); *In re M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510

(2008). Where a party is required to establish its case by "clear, cogent, and convincing" evidence, this court incorporates that standard of proof into its review. *In re Trust & Estate of Melter*, 167 Wn. App. 285, 301, 273 P.3d 991 (2012).

*Necessary Services*

The question is whether all necessary services were provided. We agree with the trial court that the appropriate services were offered.

At issue is RCW 13.34.180(1)(d):

> (d) That the services ordered under RCW 13.34.136[4] have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

It is the State's burden to establish this factor by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i).

This factor requires DSHS to offer all necessary services capable of correcting J.G.'s parental deficiencies within the reasonable future. *In re M.R.H.*, 145 Wn. App. at 25. DSHS must tailor the services it offers to meet each individual parent's needs. *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). It must provide all court ordered and necessary services to the parent. *In re Dependency of D.A.*, 124 Wn.

---

[4] RCW 13.34.136 requires the creation of a permanency plan for determining the child's future living situation. The permanency plan is developed in conjunction with the dependency action. RCW 13.34.136(1).

6

App. 644, 651, 102 P.3d 847 (2004). A service is "necessary" if it is needed to address a condition that precludes reunification of the parent and child. *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010).

*Drug Treatment and Monitoring.*

J.G. argues that DSHS was required to offer him outpatient drug treatment and monitoring, but failed to do so. This claim is based on the initial evaluation he obtained prior to the dependency. It fails for several reasons.

There is no reason to believe this is a necessary service, because J.G.'s in-remission drug usage was never connected with his inability to parent E.G. The evaluation that mentions outpatient treatment was obtained before the dependency order and was not related to that action; instead, it was obtained by J.G. for a different purpose at about the same time that the original hearing order declared that "services reserved for further hearings." Ex.1-13. The subsequent dependency order states that the father shall successfully complete an "evaluation by a provider approved by the parties or ordered by the court." Ex.1-20. There is no reason to believe that the initial evaluation was ever operative in this case. Moreover, no evidence in the record suggests that drug usage has anything to do with the reason E.G. was taken from J.G., or that addressing drug usage in an outpatient setting has anything to do with E.G. returning to his father's custody.

Instead, the only use of the initial evaluation was to support the dependency judge's determination, backed by J.G.'s own requests, that another evaluation was in

7

order. Both social workers testified that it was done.[5] All of the written documentation, with which J.G. expressly agreed, indicated only that a new evaluation had been permitted by the dependency and permanency hearings. Ex.1-29-30, 33, 44, 53-54. It also indicates that DSHS had made reasonable efforts to provide the services. Ex.1-53.

Finally, a very compelling reason to conclude that the initial evaluation was irrelevant to the dependency proceeding was the fact that the father never argued the point at any time in the trial court. He did not cross-examine the State's witnesses about the issue. He never contended in closing argument that it was a non-provided service. He never claimed that his in-remission drug dependency influenced the proceedings in any manner. In short, it was a non-issue in the trial court because it had no meaningful connection to the dependency case.

The evidence amply supports the conclusion that all necessary services had been provided. Drug treatment was never a necessary service in this case.

---

[5] The first social worker's testimony was less than clear, but it appears that she referred J.G. to the local evaluation agency and that agency, not her, then also referred J.G. on to couples counseling (a fact made even more likely by the refusal of DSHS to require couples counseling in this domestic violence situation). RP at 23. The testimony is further supported by the fact that it notes the local drug evaluator made a further referral. In some manner or another, J.G. obtained the mandated evaluation from the local agency.

8

*Couples Counseling.*

The other service at issue is couples counseling, which DSHS refused to provide. While it is troubling that DSHS refused to follow the court order instead of returning to court to have the requirement removed, the issue became a moot point because of H.G.'s death.[6]

An issue is moot if a court can no longer give effective relief. *E.g.*, *In re Det. of LaBelle*, 107 Wn.2d 196, 200, 728 P.2d 138 (1986). That is the situation here. While maybe H.G. and J.G. would have benefitted from couples counseling, that is no longer possible given H.G.'s death. Remanding this case to require an impossible act makes no sense whatsoever.

It would be a futile act to require couples counseling. The failure to provide this service, while error, is not a remediable condition.

*Integration into a New Family*

The final issue presented by J.G. is a contention that the court erred in concluding that termination of the parent-child relationship was required to allow E.G. to integrate

---

[6] DSHS believed that couples counseling was not appropriate given the history of domestic violence between the couple and efforts being made to treat that situation. While the position makes logical sense, the appropriate path would have been to bring that fact before the trial judge with an explanation why couples counseling should not be required. Only the trial court could change the previous ruling.

into a new family. He argues that the current relationship is working fine without need of change.

At issue is the following statutory language:

> That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1)(f).

The operative word in the statute is "permanent."[7] This court once said, "as long as [a child] is in foster care, her living situation will by definition remain temporary. She will not have a permanent home until her parents resume custody or their parental rights are terminated and she is adopted." *In re Dependency of A.V.D.*, 62 Wn. App. at 569.

The trial court's determination is supported by substantial evidence. E.G. has never lived with J.G. He was placed in foster care with his maternal aunt and uncle his entire life. J.G. and E.G. do not have a parental bond, but only a tenuous social one. E.G. needs permanency. The existence of the parent-child relationship alone precludes adoption, therefore it diminishes E.G.'s chances for early integration in a stable and *permanent* home. The trial court did not err in concluding that continuation of J.G.'s parental status would prevent E.G. from timely receiving a permanent home.

---

[7] *See* RCW 13.34.020, the final sentence of which states: "The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter."

10

No. 33741-3-III
*In re E.G.*

There also was no obligation to rule out other options. "Nothing in the termination statutes directs a court to consider a dependency guardianship as an alternative to termination." *In re Dependency of K.S.C.*, 137 Wn.2d 918, 930, 976 P.2d 113 (1999). Here, as in *K.S.C.*, "there was no dependency guardianship . . . prior to the termination hearing, and no petition for or approval of a guardianship at the time of or after termination." *Id*. at 929. J.G.'s belated argument that one ought to have been considered prior to termination is without merit. He never proposed a guardianship. He simply argued that he was the victim of a rush to judgment since DSHS never sought other possible options short of termination. There being no proposal for a guardianship, the trial court could not have erred by failing to investigate the possibility.

The order terminating the parent-child relationship is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, J.

I CONCUR:

_____
Pennell, J.

11

No. 33741-3-III

FEARING, C.J. (dissenting) — I would remand this appeal for an additional hearing before the trial court. The trial court did not expressly find that the State provided Joshua Gerald the ordered service of outpatient cannabis treatment, and the trial court made no finding that treatment would be useless. On remand, the State should clarify whether it provided outpatient treatment. Thus, I dissent from the majority's affirmation of the termination order.

FACTS

Joshua and Hannah Gerald bore Elton Gerald. Because of the death of Hannah Gerald, this appeal concerns only the parental rights of Joshua Gerald. All names are fictitious. I do not repeat background facts mentioned in the majority opinion.

On February 7, 2013, the State of Washington Department of Social and Health Services (DSHS) filed a dependency action for Elton Gerald. On February 11, 2013, the superior court entered a shelter care hearing order that placed Elton in the care of his maternal aunt and uncle. Elton remains in their care. For some unknown reason, the dependency petition hearing did not transpire until five months later. In the meantime,

DSHS began providing services to Joshua and Hannah Gerald to facilitate Elton's reunification with his parents. The shelter care hearing order directed Joshua and Hannah to undergo random urinalysis and blood alcohol screenings.

In February 2013, Judy Warren, Joshua Gerald's first social worker, referred Joshua to Dr. Scott Mabee for a psychological evaluation and Carol Thomas for a parenting assessment. Joshua did not attend either appointment.

At the time of the dependency action, Joshua Gerald smoked marijuana daily. At some unknown times, Joshua underwent three urine samples, two positive for marijuana and one clean. In February 2013, Joshua completed a chemical dependency assessment that showed he suffered from an active cannabis dependency. The assessment recommended outpatient treatment weekly for Joshua's dependency.

The majority writes:

> The evaluation that mentions outpatient treatment was obtained before the dependency order and was not related to that action; instead, it was obtained by [Joshua Gerald] for a different purpose at about the same time that the original hearing order declared that "services reserved for future hearings." Ex. 1-13.

Majority at 7. The majority does not identify the supposed "different purpose" for the February cannabis assessment and recommendation. The record shows no other purpose than for the dependency action.

In May 2013, Sean Smitham, a clinical psychologist who specializes in psychological evaluations and individual and family therapy, performed a psychological

2

assessment of Joshua Gerald. Smitham diagnosed Joshua with an unspecified personality disorder with narcissistic and antisocial traits. According to Smitham, the disorder led, in part, to Joshua justifying criminal behavior. The disorder would render him unlikely to accept criticism and direction on parenting a child. Joshua would also lack an ability to notice cues from a child as to the child's needs. Consistent with his narcissistic personality, Joshua denied any anger management problems to Smitham. Smitham recommended that Joshua engage in parenting classes, individual therapy, family therapy with his wife, and family therapy with his parents. Smitham further recommended that Joshua undergo domestic violence and substance abuse evaluations, gain vocational skills, and obtain better housing.

In July 2013, Joshua Gerald, at a referral from DSHS, went to Bridges to Safety, a Cusick facility that operates a domestic violence perpetrator treatment program. Vanessa Cameron, at the facility, began an assessment to determine if Joshua qualified for treatment. She could not complete the assessment until February 2014 because Joshua refused to sign a release. The record does not disclose the nature of the release. In the meantime, Joshua participated in group treatment.

On August 27, 2013, the trial court entered an order of dependency. In the order, the court found that Elton Gerald lacked a parent capable of adequately caring for him. The dependency order directed Joshua Gerald to complete a drug and alcohol evaluation, undergo a psychological evaluation, submit to a domestic violence perpetrator

3

assessment, participate in random urinalysis and blood alcohol follicle testing, and join in couple's counseling. The order also directed Joshua to follow all recommendations of the evaluations. In February, Joshua previously completed a drug and alcohol evaluation and a psychological evaluation, about which I have written. The dependency order does not specify if Joshua needed to repeat either evaluation. The record shows no chemical dependency evaluation other than the February 2013 evaluation. The February evaluation recommended outpatient treatment for Joshua's cannabis dependency. No record shows that DSHS referred Joshua for outpatient cannabis dependency treatment.

Pend Oreille Counseling Center referred Joshua Gerald for couple's counseling. Joshua asked for the counseling. Joshua and Hannah Gerald never received couple's counseling, however. Kathy Bennett, Joshua's second social worker, terminated the referral because of ongoing domestic violence. According to Bennett, until Joshua resolved his desire to control Hannah, counseling would only cause conflict.

In April 2014, the Pend Oreille Superior Court, as a result of Joshua Gerald's criminal conviction for assaulting a law enforcement officer, also referred Joshua for treatment to Bridges to Safety at the latter's Spokane facility. The record does not tell whether the treatment for the second referral differed from earlier treatment. Joshua last attended treatment on May 6, 2014. According to Vanessa Cameron, the treatment did not successfully address Joshua's issues of aggressive and controlling behavior in relationships. He made improvements but then returned to his former behavior. During

treatment, Joshua alternately expressed love toward his wife Hannah and wanting to never see her again. He blamed his anger on Hannah and failed to use tools taught to control his anger.

After an August 14, 2014, dependency review hearing, the trial court entered an order that documented that Joshua Gerald sought referral for a substance abuse evaluation. The record does not show any referral after February 2013.

An October 31, 2014, dependency review hearing order states that Joshua Gerald completed psychological evaluations and treatment recommended as a result of the evaluations. Contrary to the majority opinion, the October 31 order does not declare that Joshua completed treatment recommended as a result of chemical dependency evaluations.

Darren Woods, a mental health therapist under contract with DSHS, began family therapy for Joshua and Elton Gerald in February 2015. The father and son had not visited one another for more than one year. Woods sought to reestablish a relationship between them. Despite initial concerns, Woods noted Elton encountered no reluctance in separating from his maternal aunt and uncle and spending time with his father. Woods engaged Elton and his father for nine sessions from February through May 2015. During the visits, Joshua progressed in reestablishing a relationship with his son. When asked how he quantified progress, Woods replied:

> [Elton] was—there was a significant change in regards to [Elton] in

5

their interactions—Proximity had been—He was willing to get much closer, he was willing to give hugs, he initiated hugs. He initiated contact and—assistance from [Joshua]. He always was very happy to see [Joshua], positive kinds of greeting responses. At times [Elton] didn't want to leave.

. . . .

And—and he used his father. It's real important in regards to the attachment and relationship that—for the child [to] demonstrate that he's seeking out his—his caregiver to meet his needs rather than, say,—me, and—and over time [Elton] was doing that. [Elton] was getting assistance and the help from [Joshua]. And [Joshua] was meeting—meeting his needs.

Report of Proceedings (RP) at 113.

Darren Woods never had any concerns for Elton Gerald's physical or emotional safety during visitations with his father. Joshua Gerald never exhibited aggressive or uncontrolled behavior.

Beginning in March 2015, Darren Woods also provided Joshua Gerald individual therapy. The therapy initially focused on controlling anger and other emotions. Unfortunately, wife Hannah died shortly after Woods started counseling Joshua, so the focus switched to counseling Joshua for the grief and loss associated with Hannah's death.

Joshua Gerald unilaterally terminated therapy with Darren Woods by voicemail on May 19, 2015. Apparently, Joshua misbelieved that Woods possessed authority to increase the frequency of the father-son visits, but refused to do so.

6

PROCEDURE

The State of Washington filed a petition to terminate the parental relationships of Joshua and Hannah Gerald to Elton on July 23, 2014. Hannah died on March 16, 2015.

On July 20, 2015, trial to terminate Joshua Gerald's parental rights began. During trial, Vanessa Cameron, the domestic violence perpetrator treatment counselor, testified that she does not know if Joshua needs additional domestic violence counseling. Cameron opined that mental health problems and drug abuse prevented Joshua from improving during counseling. The domestic violence problems could not be solved until Joshua resolved his mental health and drug problems. Cameron also testified that Joshua was not ready to parent a two-and-a-half-year-old child.

In a critical passage for this appeal, social worker Judy Warren testified at trial about DSHS referrals for Joshua Gerald:

> Q So between the time of the—of the shelter care and the time you left the case in July of 2013, did you make any other referrals for services for [Joshua]?
> A Yes. (Inaudible). He himself—went down in early February and completed a chemical dependency assessment. And the assessment was that he—(inaudible) chemical dependency that was in full remission and a cannabis dependency, active, and he needed outpatient treatment once a week. *And so I made the referral for that—Pend Oreille Counseling Center,—chemical dependency assessor there had also made the referrals for that. I referred him to—No, I don't think I referred him.* He was referred by Pend Oreille Counseling Center for individual couples counseling also. (Inaudible) with them.

RP at 23 (emphasis added).

Dr. Sean Smitham, the psychologist who evaluated Joshua Gerald, explained during trial that Joshua needed years of treatment to correct his narcissistic distortions and to change his behavior. Smitham also declared that Joshua's psychological profile rendered it difficult for him to complete therapy because Joshua believes Joshua knows more than the counselor.

Therapist Darren Woods testified, during trial, that his nine sessions of family therapy with Joshua and Elton Gerald were insufficient to permit Joshua to begin parenting. Nevertheless, Joshua made "good progress" in building a relationship with his son and additional sessions could have helped further.

Social worker Kathy Bennett testified at trial that Elton Gerald's placement with his maternal aunt and uncle provided the boy with "stability" and the ability to thrive. Elton was "healthy physically and emotionally." RP at 202. The couple were willing to provide Elton a permanent home.

During trial, Kathy Bennett testified with regard to services provided to Joshua Gerald:

> Q What does Mr. [Gerald] have yet to—to do with regard to services in this case? What's been ordered that he hasn't done?
> A He—He's done with services. I'm—Well, he began individual mental health counseling; that's something that has to happen. He's completed—domestic violence perpetrator treatment. He did his psycho' eval', neurological psych' evaluation but didn't follow the recommendations, one of which included individual mental health—therapy.
> And it doesn't seem like he made much progress with Vanessa, with

8

the domestic violence.

Q So what remains for Mr. [Gerald] to do?

A I'm not sure what more we can do for Mr. [Gerald].

Q Has every—service that's been court-ordered been referred for Mr. [Gerald]?

A Yes. And services that have not been court-ordered have been referred, also. Unfortunately Mr. Gandy has a tendency to fire people, which upsets people that are being paid, by the Department—

MR. TRAGESER: —object. This is non-responsive, your Honor.

THE COURT: The second part is, so I'll—I'll sustain that.

THE WITNESS: Okay.

Q So what—what—what—does he have yet to do?

A He still has the individual counseling.

RP at199-200.

Following trial, the trial court terminated Joshua Gerald's parental rights to Elton.

The court entered the following findings of fact:

> Services court-ordered under RCW 13.34.130 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting parental deficiencies within the foreseeable future have been offered or provided. These include social work services by Judy Warren and Kathy Bennett; travel assistance (gas vouchers); individual counseling with Angela Pavey; Domestic Violence Perpetrator Treatment with Vanessa Cameron; a Parenting Assessment with Carol Thomas; a psychological assessment with Dr. [Sean] Smitham; and Therapeutic Visitation and Family Therapy with Darren Woods.
>
> The relationship between [Joshua Gerald] and nearly every provider in this matter has been contentious, if not volatile. . . .
>
> The father ultimately complied with the court's order to secure a psychological assessment, but only after not appearing at the initial appointment with Dr. Mabe[e] on February 22, 2013. [Joshua] secured a psychological assessment with Dr. [Sean] Smitham on May 6, 9, and 14, 2013. Dr. Smitham diagnosed [Joshua] with a Personality Order Not Otherwise Specified (NOS), with narcissistic and anti-social traits. . . . Dr. Smitham opined that [Joshua's] prognosis was guarded to fair in terms of providing emotionally secure and psychologically stable parenting to a

9

child, as the nature of the personality disorder and associated traits were, in themselves, a substantial impediment to accepting services critical to addressing the impacts of the personality disorder.

[Joshua] engaged extensively in Domestic Violence education and treatment, even attending more than the required measure of sessions to complete the program. Here again, though [Joshua] expressed some resistance to fully engaging in the program. . . .

In April, 2014, [Joshua] was referred to the program as a result of a criminal sentence and, per policy, this recommenced the program anew. . . successful completion of the program was not the equivalent of successfully addressing [Joshua's]'s issues. Ms. Cameron opined that, even after 10 months of the service, [Joshua's] diagnosis remained the same— his intimate relationships were marked by a pattern of aggressive and controlling behaviors.

. . . .

Mr. Woods [the therapeutic visitation coordinator and therapist] opined . . . that it would likely take a long period of time for [Joshua] to achieve emotional regulation, even with appropriate therapy.

Clerk's Papers (CP) at 154-59. Although the trial court found that the State provided all court ordered services, the trial court did not include marijuana dependency treatment as a service provided by DSHS. The trial court also entered no finding that the provision of cannabis dependency treatment would not benefit Joshua Gerald.

## LAW AND ANALYSIS

On appeal, Joshua Gerald contends the trial court committed three errors. First, the evidence did not show that the State provided all ordered and necessary services to remedy his parental deficiencies. Second, insufficient evidence supported the conclusion that continuation of the parent-child relationship would diminish Elton's prospect for early integration into a permanent and stable home. Third, the trial court did not

adequately explore alternatives to termination. I concur with the majority in its rulings

concerning Joshua's second and third assignments of error. I agree with Joshua's first

assignment of error at least to the extent the record is unclear whether the State provided

Joshua with cannabis dependency treatment, one of the ordered services.

Joshua Gerald contends that the State failed to provide three ordered services:

outpatient drug treatment, urinalysis and blood alcohol follicle testing, and couple's

counseling. In response, the State contends that couple's counseling was inappropriate

given the ongoing domestic violence issues in the relationship. Also, the record shows

that DSHS provided testing. The State, however does not claim it provided outpatient

cannabis treatment, nor does it address in its appeal brief any failure to provide outpatient

treatment. The State does not argue that providing cannabis treatment would be futile.

This appeal carries constitutional concerns. Parents have a fundamental liberty

interest in the care, custody, and control of their children. *Santosky v. Kramer*, 455 U.S.

745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). The United States Supreme Court

has long recognized a constitutionally protected interest of parents to raise their children

without state interference. *Wisconsin v. Yoder*, 406 U.S. 205, 235-36, 92 S. Ct. 1526, 32

L. Ed. 2d 15 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 534, 45 S. Ct. 571, 69 L.

Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042

(1923). The liberty interest of parents may be the oldest of the fundamental liberty

interests recognized by the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct.

11

2054, 147 L. Ed. 2d 49 (2000) (plurality opinion). Despite many parents being untrained, unprepared, and inept in the art and science of raising a child, American law recognizes a natural right attached to the biological processes of siring and bearing a child. This right precedes law. The rights to conceive and to raise one's children are deemed "essential," "basic civil rights of man." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942); *Meyer v. Nebraska*, 262 U.S. at 399 (1923).

In Washington, the State's termination of parental rights undergoes a two-step process in part to pass constitutional muster. *In re Welfare of C.B.*, 134 Wn. App. 942, 952, 143 P.3d 846 (2006). First, the State must show that six statutory requirements under RCW 13.34.180(1) are established by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i). Second, the State must show a termination order serves the best interests of the child. RCW 13.34.190(1)(b). The trial court must find by a preponderance of the evidence that termination is in the best interests of the child. *In re Welfare of M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008).

Under the first step of a parental termination proceeding, the State must prove the following six elements:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order . . .
> (c) That the child has been removed . . . from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

12

      (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

      (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . .

      (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. . . .

RCW 13.34.180(1). I focus on RCW 13.34.180(1)(d) that requires the provision of services to reunite the parent with the child.

The dependency order directed the completion of a drug dependency evaluation and the provision of any services recommended by the evaluation. The February 2013 evaluation recommended weekly cannabis dependency outpatient treatment. The majority, without any support in the record, contends that the February evaluation had no relationship to the dependency action. Nevertheless, no evidence discloses any other purpose for the evaluation, and the evaluation occurred after the filing of the dependency action. The State conceded that some evaluation recommended cannabis dependency treatment, and the record shows no other evaluation, let alone an evaluation with such a recommendation. None of the State's witnesses referred to any drug dependency evaluation other than the February 2013 evaluation. The State has never argued that the February evaluation and recommendation lacked any relationship to Elton Gerald's dependency action. If the February evaluation did not constitute the evaluation relevant

13

to this dependency case, the State failed to obey the order directing the completion of an evaluation.

Assuming the State did not provide the cannabis dependency treatment, the State ignored the dictate of RCW 13.34.180(1)(d), which demands that "the services *ordered* under RCW 13.34.136 [be] . . . expressly and understandably offered or provided." (Emphasis added.) The statute provides no excuse to the State to avoid providing services ordered.

Washington decisions repeat the obligation to provide ordered services. The State must provide all court-ordered and necessary services to the parent. *In re Dependency of D.A.*, 124 Wn. App. 644, 651, 102 P.3d 847 (2004). The statute expressly requires both that all services *ordered* have been provided, *and* that all *necessary* services reasonably available have been provided. *In re Dependency of T.L.G.*, 126 Wn. App. 181, 200, 108 P.3d 156 (2005). The services must be affirmatively offered or provided, not merely recommended. *In re Welfare of Hall*, 99 Wn.2d 842, 850, 664 P.2d 1245 (1983). To meet its statutory burden, DSHS must, at a minimum, provide the parent with a referral list of agencies or organizations that provide the services. *In re Welfare of Hall*, 99 Wn.2d at 850. Termination must be reversed when DSHS fails to prove it has affirmatively offered or provided all ordered and necessary services. *In re Dependency of H.W.*, 92 Wn. App. 420, 430, 961 P.2d 963, 969 P.2d 1082 (1998).

The disagreement between the majority and me principally surrounds whether the

record confirms that the State offered the weekly cannabis dependency treatment, and, in turn, whether the trial court found that the State offered the service. Despite arguing that the recommendation for cannabis dependency treatment had no bearing on the dependency action, the majority concludes that the trial court found that the State provided a cannabis dependency outpatient treatment program. I doubt this.

The majority relies on social worker Kathy Bennett's testimony that the State provided all ordered services to Joshua Gerald. Nevertheless, Bennett never averred that the State rendered cannabis treatment available.

The majority also relies on social worker Judy Warren's testimony that the State referred Joshua Gerald for outpatient cannabis treatment. Nevertheless, the testimony either refutes the majority's position or is indeterminate. Warren started to testify that she made a referral, but then halted and declared: "No, I don't think I referred him." RP at 23. Warren then commented on a referral to couple's counseling. The earlier denial of a referral could have referred to couple's counseling, but reading the testimony logically, the denial of "No, I don't think I referred him" referenced cannabis treatment. At best, Warren's testimony is hopelessly confusing, and abridging a constitutional right should never rest on oblique testimony.

The majority insists that the trial court found that the State provided cannabis treatment, and indeed the trial court found that DSHS provided all ordered services. Nevertheless, the trial court never found that the State afforded or referred Joshua for

15

cannabis outpatient treatment. The trial court included in its findings an exhaustive list of services provided. The trial court conspicuously omitted cannabis dependency treatment from the list. During the course of the trial, the State presented no records showing a referral for outpatient dependency treatment.

When the trial court has weighed the evidence, our review is limited to determining whether the court's findings of fact are supported by substantial evidence. *In re Dependency of P.D.*, 58 Wn. App. 18, 25, 792 P.2d 159 (1990). Substantial evidence is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise. *In re Welfare of T.B.*, 150 Wn. App. 599, 607, 209 P.3d 497 (2009). This court, however, will not sustain a finding of fact when the only evidence is to the contrary. Thus, we should not sustain a finding that the State provided all services ordered by the court when the testimony does not confirm the finding.

The majority writes that the record contains no evidence that a cannabis dependency interfered in Joshua Gerald's parenting. Assuming such to be accurate, the trial court should not have ordered a dependency evaluation and directed that Joshua follow any recommendation arising from the evaluation. Nevertheless, the majority misstates the record. Vanessa Cameron, the domestic violence perpetrator treatment counselor, testified that drug abuse prevented Joshua from improving during counseling. According to Cameron, the couple's domestic violence problems could not be solved until Joshua resolved his drug problems.

16

I recognize that, when the record establishes that the offer of services would be futile, the trial court may excuse DSHS from offering the services. *In re Welfare of M.R.H.*, 145 Wn. App. at 25 (2008). When DSHS inexcusably fails to offer or provide necessary services, termination is appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future. *In re Hall*, 99 Wn.2d at 850-51; *In re Dependency of T.R.*, 108 Wn. App. 149, 164, 29 P.3d 1275 (2001). I further recognize the possibility that outpatient drug treatment may not have cured Joshua Gerald's parental deficiencies. Nevertheless, the State provided no testimony that the provision of drug treatment would be futile. One State witness testified to the treatment's necessity. The trial court entered no finding that outpatient treatment would fail to benefit Joshua.

Joshua Gerald is not a model father, and the State may eventually show that his parental rights should be terminated. For this reason, the majority may find it easy to affirm the trial court's termination of parental rights. Nevertheless, courts play a unique role in assuring that the State complies with the law before terminating a parent's constitutional right to his or her child, particularly when the State, compared to the parent, possesses sizable resources. The law demands that the State follow a full panoply of rules before terminating a parent's rights to the care and custody of his or her child. This court should not affirm a termination order without the record lucidly supporting compliance with all rules. Our appellate record does not intelligently show that the State followed all rules. At the very least, this court should remand the case for a clarification

17

No. 33741-3-III
*In re the Parental Rights to E.G.*

of the record to determine whether the State offered Joshua Gerald cannabis dependency

treatment and, if not, whether the services would be futile.

_Fearing, J._

Fearing, C.J.